| | | |
|---|---|---|
| EMIGRANT MORTGAGE | : | |
| COMPANY, INC. | : | |
|      PLAINTIFFS, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:05-cv-1772 (JCH) |
| | : | |
| JANICE CRISMARA et al., | : | JUNE 18, 2008 |
|      DEFENDANTS. | : | |

**BENCH TRIAL RULING**

I.    INTRODUCTION

The plaintiff, Emigrant Mortgage Company ("Emigrant"), brings this action against the defendants, Janice Crismara and Helen Crismara, seeking to foreclose on a mortgage given by the Crismaras to secure a Note given by Janice Crismara and to recover damages arising from the alleged default on the Note owed to Emigrant (Count One), breach of contract (Count Two), bad faith (Count Three), fraud (Count Four), and negligent misrepresentation (Count Five). <u>See</u> Second Amended Complaint (Doc. No. 24). Emigrant's claims were tried to the court on May 27 and 28, 2008.

II.    FINDINGS OF FACT

    A.    <u>The Crismaras, their business, and the subject property.</u>

Janice Crismara graduated from George Washington University with a degree in history in 1968. In 1969, she went to work for her mother's company, the Cris Group, Inc. The Cris Group is a corporate recruiting firm. The firm was successful throughout the nineties. In its best year, the firm grossed about $300,000. While the Cris Group used to be a general recruiter, over the past ten years the Cris Group has focused on

recruiting for consulting, financial services, accounting, and technology firms. Janice Crismara is currently managing the firm, though prior to 2002, Janice Crismara had no responsibilities for paying taxes, bookkeeping, or paying bills for the firm.

After 1999, the firm's business suffered because of a downturn in the economy. In 2002, the Cris Group closed the two offices it had in Manhattan, and let go its two employees, due to financial difficulty. During that year, Janice Crismara also suffered a foot injury which severely restricted her mobility for several months. Since that time, the firm has been operating out of the Crismaras' home in New Canaan, at 75 Danvers Lane ("the property").

Helen Crismara gifted a half interest in the property to Janice Crismara around 1995. In 2002, the IRS placed a tax lien on the property of approximately $230,000 due to unpaid corporate taxes. The firm also owed the State of Connecticut between $30,00 and $35,000 in taxes at the time. That same year, Janice Crismara took out a mortgage with Chase, but found herself having difficulty making the payments and was at one point sixty days overdue.

Because she was having difficulty paying her Chase mortgage, Janice Crismara engaged a mortgage broker named Guardhill Financial Corp to help her refinance the house. See Pl.'s Ex. 1. Because her income was low and her credit score poor, Janice Crismara believed she would need help securing refinancing for the property. On September 26, 2002, she signed an agreement with Guardhill in which she agreed to pay them one per cent of any loan she received, in addition to an application fee and property appraisal fee. See Guardhill Preapplication and Fee Disclosure, Pl.'s Ex. 3. Guardhill recommended that Crismara refinance with Emigrant, with whom it told her it

had worked before and who would make Crismara a loan.  Guardhill did not disclose to Janice Crismara it had a contractual relationship with Emigrant.  <u>See</u> Pl.'s Ex. 4.  They did not offer her any alternative loans or give any indication that they had talked to lenders other than Emigrant.

Crismara hired an accountant to help secure from the IRS subordination of the tax lien so that she could refinance the property.  She also hired the law firm of Lampert, Williams & Toohey, LLC ("Lampert, Toohey"), which was referred to Janice Crismara by her regular attorney.  She met with Bob Lampert and signed a retainer agreement.  At the closing, she paid the firm $1,000 for its assistance in the loan transaction ("settlement or closing fee") and $4,500 for "previous attorney's fees."

Janice Crismara knew that she was getting a mortgage that did not require income verification.  She wanted that type of loan because at that time she did not have a substantial income.  She knew at the time she received the loan that Emigrant was aware of her IRS tax lien and her poor credit score.  <u>See</u> Letter from Emigrant, Pl.'s Ex. 71 (noting "Loan amount reduced due to value of collateral, as reviewed, insufficient for loan amount requested and derogatory credit.").

B.    The mortgage and loan documents.

Janice Crismara received and signed commitment letters from Emigrant on four occasions.  She signed a commitment letter dated December 16, 2002.  <u>See</u> Commitment Letter, Pl.'s Ex. 6.  She received a revised Commitment Letter dated February 25, 2003.  <u>See</u> Letter, Pl.'s Ex. 11.   She signed this letter on March 3, 2003. <u>See</u> Pl.'s Ex. 11. She received yet another Commitment Letter, dated June 10, 2003. <u>See</u> Pl.'s Ex. 13. Because all three of these letters contained asterisks for several

important terms, including the contract rate of interest, Janice Crismara assumed that they were non-binding preliminary documents, or part of a "work in progress." Having never taken a mortgage before, Janice Crismara assumed that it was common for terms to be left undetermined in a Commitment letter. Janice Crismara signed the final Commitment Letter at the closing. <u>See</u> Pl.'s Ex. 17.

All of these Commitment Letters contained a paragraph stating that, "[i[n the event of any default under your loan documents, the interest rate of this loan . . . will be increased to 18% per annum . . . ." <u>See</u> Pl.'s Ex.s 6,11 and 17 at ¶ 18. At no time did Janice Crismara have an attorney review the Commitment Letters with her.

Janice Crismara also received a letter, dated December 16, 2002, which estimated the amount of the monthly payments Crismara would owe on a $700,000 note as between $5,382 and $6,366 per month. <u>See</u> Letter ("Resource letter"), Pl.'s Ex. 7. Janice and Helen Crismara signed a Resource Letter at the closing on July 15, 2003, which contained the following:

> BY SIGNING BELOW, YOU CONFIRM YOUR ABILITY TO MAKE THE
> MONTHLY PAYMENTS SHOWN ABOVE ON A TIMELY BASIS . . . AND
> THAT YOU ACKNOWLEDGE THAT EMIGRANT IS RELYING ON YOUR
> CONFIRMATION OF YOUR ABILITY TO REPAY THE LOAN IN
> CONSUMMATING THE CLOSING OF THE LOAN.

Letter, Pl.'s Ex. 22 (emphasis in original). Janice Crismara thought hard about her ability to make these payments before signing these letters and decided that she could. She reasonably believed that her income would be increasing because she was courting new clients and undertaking a repositioning of her business. She knew that the business had survived economic downturns in the past, and she believed the business would bounce back when the economy rebounded. She also seriously

considered the possibility that she would have to sell her home and believed that her mother would agree. (Her mother also signed the Resource Letter.)[1] Janice Crismara did not know at that time she signed these letters that her mother would not agree to sell the home; indeed, she thought her mother would, if need be. In addition, Janice Crismara had the "strong commitment of a friend" that until she was able to get her business into better shape, he would help her keep current on the mortgage. This family friend did help Janice Crismara make several mortgage payments. Eventually, however, he was unable, due to an unexpected divorce, to continue to help Janice Crismara make the payments.

Janice Crismara also received a Truth-in-Lending Disclosure which provided that, "[i]f the loan is in default, a default interest rate of 18% may be imposed until default is cured." Truth-in-Lending Disclosure, Pl.'s Ex. 8. She received a revised Truth-In-Lending Disclosure, dated February 25, 2003, which contained language on the default interest rate. See Truth-In-Lending Disclosure, Pl.'s Ex. 12. She signed yet another Truth-in-Lending Disclosure, on July 2, 2003, containing the same language as the others as to the default interest rate. See Pl.'s Ex. 14. She signed a final Truth-in-Lending Disclosure, on July 15, 2003, at the closing, which contained the same language regarding default interest. See Pl.'s Ex. 19.

---

[1]Why Helen Crismara would be asked to sign the Resource Letter is not apparent on the record. See Pl.'s Ex. 22. It is clear from the terms of the mortgage that Helen Crismara signed the mortgage only to perfect the lien on the jointly held property, see Pl.'s Ex. 24 at 4, and Emigrant does not assert that Helen Crismara is an obligor on the Note. Therefore, the court sees no reason for Helen Crismara to have made any representation to Emigrant regarding Janice Crismara's ability to repay the Note, on which she was not an obligor. Having signed it, however, Helen Crismara is on record at the closing of acknowledging that her daughter might have to sell the house.

At the closing, Janice Crismara signed an "Adjustable Rate Note" ("the Note"), which contains a provision titled "Limits on Interest Rate Charges," which provides that the "interest rate will never be greater than 15.625%." Note, Def.'s Ex. 79 at 2, section 4(D). This provision does not make any reference to a different rate of interest in the event of default. Id. Similarly, the mortgage deed ("the Mortgage") that Janice Crismara signed at the closing contains an "Adjustable Rate Rider," which also states that the "interest rate will never be greater than 15.625%." Def.'s Ex. 80. This provision also makes no mention of a different rate of interest in the event of a default. See id.

The Note also contains a "Default Interest Rate Rider." See Def.'s Ex. 79 at 7. By its terms, the Rider deletes and replaces Paragraph 2 of the Note, but makes no mention of section 4(D). See id. That Rider does not purport to modify the adjustable rate rider to the mortgage. See id. At no point did Janice Crismara ask her attorney or her mortgage broker any questions about the Default Interest Rate Rider, nor did they call it to her attention.

C.      The closing.

At the closing, Janice Crismara learned for the first time that the interest rate on her Note would be 9.624%. See Pl.'s Ex. 17. She did not read it or any other documents that she signed at the closing. Crismara's attorney did not specifically explain any of the terms of the Note at the closing or any other time. See Pl.'s Ex. 24. Neither her attorney, nor anyone from Emigrant, nor her mortgage broker brought the default interest rate to her attention, or explained why her rate could be higher than the maximum stated contract rate. At the closing, Janice Crismara felt that she was unable to ask questions because she felt she was being rushed. She trusted her attorney to

explain anything to her that she needed to know and to act in her best interest.

No one at the closing, including her attorney, brought to her attention that a mortgage provision stated that the attorney at the closing represented Emigrant and not Janice Crismara. See Pl.'s Ex. 17. Holly Perlowitz, a Senior Vice President and Chief Financial Officer of Emigrant, testified that this error was caused by a "programming error," rather than a human error, although her testimony was inconsistent as to the cause. The programming error did not cause Emigrant's counsel to be mistyped on an earlier Commitment Letter dated June 10, 2003. See Pl.'s Ex. 13. Emigrant never informed Janice Crismara that the Commitment Letter she had signed was erroneous, despite discovering the error.

> D.     The foreclosure proceedings.

Janice Crismara was in default on the Emigrant Loan in March 2004. See Pl.'s Ex. 82. She did not borrow any money from family or friends to make her mortgage payments after that time. On May 10, 2004, she received a letter from Emigrant Mortgage stating that the bank was initiating foreclosure proceedings on the property. See Def.'s Ex. 83. In response to this letter, Janice Crismara contacted an attorney. Emigrant filed for foreclosure in state court on May 10, 2004. See Def.'s Ex. 84. Emigrant moved for summary judgment on November 9, 2004. See Def.'s Ex. 90. The State Court denied Emigrant's Motion for Summary Judgment. See Def.'s Ex. 95. Emigrant withdrew the state court foreclosure action on July 26, 2005. See Def.'s Ex. 97.

During the pendency of the foreclosure, Janice Crismara has not been paying the property taxes. Janice Crismara attempted to pay the taxes the first year they were

due while they were in default, but she was told after paying the taxes that Emigrant had already paid them.  The tax assessor did not return the funds even though Emigrant had already paid the taxes.  Janice Crismara has not attempted to pay real estate taxes on the property since that time.

The property was appraised by Advanced Appraisal Associates, LLC as of April 17, 2008.  See Appraisal, Pl.'s Ex. 26.  The property was appraised at $1,700,000 based on sales comparisons.  See id.  There are no outstanding liens on the property at this time.

III.    CONCLUSIONS OF LAW

A.    Plaintiffs may foreclose on both Janice and Helen Crismara's interest in the property.

The court finds that Janice Crismara has defaulted on the Note and thus Emigrant may, as a matter of law, foreclose the Mortgage.  Defendants do not dispute that Janice Crismara defaulted on the loan and foreclosure against her interest may enter.

Defendants argue, however, that Emigrant may not foreclose on Helen Crismara's interest in the property because she is not an obligor on the Note and "'the mortgage follows the note . . . .  The mortgage cannot survive the extinction of the debt.'"  Defs' Amd. Pretrial Mem. at 29 (quoting Franklin Credit Management Corp. v. Nicholas, 73 Conn.App. 803, 848 (2002)).

In support of its position, Emigrant cites two Connecticut Superior Court cases where courts have concluded that the interests of a co-owner who executed a mortgage may be foreclosed even though that mortgagor was not an obligor on the underlying

note.  See Pl.'s Trial Brief at 5-7 (citing State St. Mortgage v. Matrix Development Corp., 1991 WL 188773 at *2 (1991), Ex. B to Pl.'s Trial Brief; First Commerce of America v. McDonald, 1995 WL 592432 at *3 (1995), Ex. C to Pl.'s Trial Brief.).  While these unpublished cases are not controlling, the court finds their reasoning persuasive.  Both cases rely on the notion that, "[a] note and a mortgage given to secure it are separate instruments, executed for different purposes."  First Commerce, 1995 WL 592432 at *3; State St., 1991 WL 188773 at *2.   While "the mortgage deed must provide, on its face, "reasonable notice" of the obligation it purports to secure," Dart & Bogue Co. v. Slosberg, 202 Conn 566, 578 (1987),  "[i]t is not necessary, however, that a mortgage deed recite with particularity all of the details of the underlying transaction" because "[t]he object of the [mortgage] is to identify the note or debt secured by the mortgage and give reasonable notice of the extent of the encumbrance. All the terms of the note are not essential to that object; hence all need not be stated ."  Id. at 578-9.  The court finds that the note secured by the mortgage at issue gave reasonable notice to the extent of the encumbrance, and Helen Crismara need not have been an obligor on the Note to receive consideration for executing the mortgage.  The giving of a loan by Emigrant to her daughter was consideration for Helen Crismara giving a mortgage on her property interest.

B.    Defendants' Motion in Limine

Defendants argue that Connecticut General Statute section 49-1 precludes Emigrant from obtaining a judgment on its common law claims if Emigrant is awarded a judgment of foreclosure of its mortgage under Connecticut law.  See Def.'s Mot. in Limine at 1, Exhibit to Def.'s Pre-Trial Mem. (Doc. No. 82).  Defendants' argument is

based on the language of section 49-1, which provides that "[t]he foreclosure of a mortgage is a bar to any further action upon the mortgage debt, note or obligation against the person or persons who are liable for the payment thereof . . . ." C.G.S. § 49-1. The Supreme Court of Connecticut has stated that, "a deficiency judgment, in light of section 49-1, is, therefore, the only available means of satisfying a mortgage debt when the security is inadequate to make the foreclosing plaintiff whole." First Bank v. Simpson, 199 Conn. 216, 219 (1966). The purpose of section 49-1 is "to determine the rights between the parties in one action." People's Bank v. Bilmor Bldg. Corp., 28 Conn.App. 809, 821 (1992).

Curiously, Emigrant did not address this issue in its Second Amended Pretrial Memorandum, or its Trial Brief. Instead, it provided the court with a single case citation to First Nationwide Bank v. Gelt Funding Corp.,27 F.3d 763, (2d Cir. 1994). In First Nationwide, the plaintiff sought damages it claimed to have suffered from the making of an under-secured loan to the defendant based on defendant's allegedly fraudulent representations. Id. at 767. The Second Circuit rejected the bank's claim that it was damaged by the making of the loan and found that the bank's injuries based on the fraud were limited to its out of pocket expenses as a result of the fraud. Id. at 768. Emigrant cites this case presumably to demonstrate that damages as a result of a fraudulently induced loan are recoverable. However, this case was decided under New York state law and does nothing to enlighten the court as to the correct reading of Connecticut General Statute section 49-1. Absent any argument by Emigrant that Connecticut law does not control this dispute, the court is at a loss as to how the Second Circuit's interpretation of New York law is relevant.

10

This question presents a difficult problem of statutory interpretation for the court, largely because neither party has provided case law interpreting section 49-1 in a similar factual situation. However, the court is persuaded that section 49-1 does not preclude Emigrant from pursuing other common law claims upon the Note or mortgage in its foreclosure action. While section 49-1 would clearly preclude Emigrant from filing a subsequent case, following a judgment of foreclosure, in which it pursued common law claims, the plain language of section 49-1 does not prevent Emigrant from seeking judgment, or the court from entering judgment, based on alternative causes of action in its suit on the Note.

C. The Crismaras did not fraudulently induce Emigrant to make the loan.

Emigrant claims that the Crismaras committed fraud upon it in connection with the making of the Note. The four essential elements of fraud are:

> (1) that a false representation of fact was made; (2) that the party making the representation knew it to be false; (3) that the representation was made to induce action by the other party; and (4) that the other party did so act to her detriment. . . . Because specific acts must be pleaded, the mere allegation that a fraud has been perpetrated is insufficient.

Whitaker v. Taylor, 99 Conn.App. 719, 730 (2007).

Emigrant claims that the Crismaras misrepresented their ability to repay the loan by signing the Resource Letter, dated July 15, 2003, which stated that,

> BY SIGNING BELOW, YOU CONFIRM YOUR ABILITY TO MAKE THE MONTHLY PAYMENTS SHOWN ABOVE ON A TIMELY BASIS . . . AND THAT YOU ACKNOWLEDGE THAT EMIGRANT IS RELYING ON YOUR CONFIRMATION OF YOUR ABILITY TO REPAY THE LOAN IN CONSUMMATING THE CLOSING OF THE LOAN.

Letter, Pl.'s Ex. 22 (emphasis in original). Emigrant claims that, when they signed this Resource Letter, the Crismara did so to induce Emigrant to make a loan to Janice

Crismara, that they both knew when they signed the Resource Letter that Janice Crismara was not able to repay the loan, and that Emigrant relied on this Resource Letter in making the loan, to its detriment.

Emigrant has not sustained its burden of proof on its fraud claim because it failed to establish that either Janice or Helen Crismara signed the Resource Letter knowing that Janice would not be able to repay the loan. At trial, Janice Crismara testified that when she received this letter, she carefully considered whether she would be able to pay off the loan. She testified that she believed her income would increase based on several clients, whose business she was actively pursuing. She had the "strong commitment" of a family friend to help her make mortgage payments if she found herself unable to. It is undisputed that this family friend had, in fact, loaned Janice Crismara substantial amounts of money in the past, at least in part to help her pay mortgage payments. She further testified that, at the time she signed the Resource Letter, she was willing to sell her home to repay the debt. She assumed at that time that her mother would agree to sell the home if the mortgage was in default; she later found out that her mother was not willing to sell the home.

In support of its position that Janice Crismara knew she would not be able to repay the loan at the time she signed the Resource Letter, Emigrant points to the fact that her income at that time was not sufficient to cover the monthly payments. Janice Crismara never disputed this point, but did testify to other sources of funds that she reasonably believed would be available to repay the loan. The court credits Janice Crismara's testimony as to her sincere belief that she would be able to repay the Note when she signed the Resource Letter. The court finds that her answers were

consistent and credible.   The court finds that Janice Crismara did not sign the

Resource Letter knowing that she would be unable to repay the loan.  There was no

credible evidence presented at trial as to Helen Crismara's state of mind, <u>other than</u> her

daughter's belief that Helen Crismara would be willing the sell the house if it was

required and Helen Crismara subscribing to the Resource letter.  This evidence does

not establish that Helen Crismara fraudulently signed the Resource Letter.  The court

finds that Janice and Helen Crismara signed the letter in good faith.  As such, Emigrant

has failed to prove its claim of fraud.

> D. <u>The Crismaras did not negligently misrepresent her ability to repay the loan.</u>

To establish that a defendant made a negligent misrepresentation, a plaintiff

must prove that "(1) the defendant made a misrepresentation and (2) the plaintiff

reasonably relied upon that misrepresentation. "<u>Savings Bank of Manchester v. Ralion</u>

<u>Financial Services, Inc.</u>, 91 Conn.App. 386, 390 (2005).  "[E]ven an innocent

misrepresentation of fact may be actionable if the declarant has the means of knowing,

ought to know, or has the duty of knowing the truth."  <u>Id.</u>  For the reasons given above,

the court credits Janice Crismara's testimony that she reasonably believed that she

would be able to repay the loan at the time she signed the Resource Letter.  For the

reasons stated above, the court finds that Emigrant has put forth no proof that Helen

Crismara negligently misrepresented her daughter's ability to repay the loan.  As such,

Emigrant's claim for negligent misrepresentation fails.

E.   The Crismaras did not act in bad faith.

 Emigrant brings a claim for "bad faith," alleging breach of the covenant of good faith and fair dealing in connection with Janice Crismara's ability to repay.  "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . .  Bad faith means more than mere negligence; it involves a dishonest purpose."  Id. (internal quotations omitted).  De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004)(internal quotations omitted)

For the reasons given above, the court credits Janice Crismara's testimony that she reasonably believed that she would be able to repay the loan at the time she signed the Resource Letter.  For the reasons given above, the court finds that Emigrant has produced no evidence that Janice Crismara signed the Resource Letter in bad faith.  As such, Emigrant's claims for breach of the implied duty of good faith and fair dealing or bad faith are dismissed.

F.   The Crismaras did not breach a contract with Emigrant.

Emigrant states that, "[t]he Resource Letter and the High Equity Loan Certificate together with the note and mortgage constitute a contract between the Plaintiff and the Crismaras."  Second Amended Complaint at ¶ 22 (Doc. No. 24).  Emigrant further claims that, "[t]he Crismaras have breached their contract with the Plaintiff by failing to accurately represent their ability to meet the payment obligation of the loan, and by failing to notify the Plaintiff of any changes to their financial circumstances that made

14

them unable to meet their payment obligations." Id. at 24.  First, as discussed above, the court finds that neither Helen nor Janice Crismara misrepresented Janice's ability to repay the loan, and as such a breach of contract claim cannot exist based on that claim.  Second, Emigrant has demonstrated no duty under any contract for the Crismaras to "notify the Plaintiff of any changes to their financial circumstances."  Id. Therefore, Emigrant has failed to prove that the Crismaras breached a contract with it as alleged in Count Two.

     G.    The loan was not unconscionable.

The Crismaras asserted a special defense of unconscionability.  The basic test for determining whether the terms of a real estate note or mortgage are unconscionable under Connecticut law is "whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract."  Hamm v. Taylor, 180 Conn. 491, 495-96 (1980) (citing Official Comment 1 to § 2-302 of the Uniform Commercial Code).  As Hamm suggests, determining whether a particular agreement is unconscionable requires a fact-intensive examination of the agreement at issue.  See  Monetary Funding Group, Inc. v. Pluchino, 87 Conn.App. 401, 411-412 (Conn.App. 2005) (quoting Family Financial Services, Inc. v. Spencer, 41 Conn.App. 754, 762-63 (1996)); see also Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 87-89 (1992).  Ultimately, however, the issue of unconscionability is a question of law to be decided by the court.  Iamartino v. Avallone, 2 Conn.App. 119, 125 (1984).

At its core, the doctrine of unconscionability protects parties to a contract from

15

oppression and unfair surprise.  <u>Cheshire Mortgage</u>, 223 Conn. at 88.  Connecticut law

reflects these two concerns by dividing the unconscionability inquiry into a substantive

and a procedural component.  "Substantive unconscionability focuses on the 'content of

the contract' as distinguished from procedural unconscionability, which focuses on the

'process by which the allegedly offensive terms found their way into the agreement.'"  <u>Id.</u>

at 87 n. 14 (quoting J. Calamari & J. Perillo, Contracts (3d Ed.) § 9-37.  Factors the

court may consider in resolving whether a certain interest rate is unconscionable

include, but are not limited to, "[t]he financial circumstances of the borrower, the

increased risk associated with a second mortgage, and the income-producing capacity

of the mortgaged property."  <u>Hamm</u>, 180 Conn. at 495.

   1. <u>The loan was not substantively unconscionable</u>.  In order for the

terms of the loan to be substantively unconscionable, they must be "so one-sided as to

be unconscionable under the circumstances existing at the time of the making of the

contract."  <u>Cheshire Mortgage</u>, 223 Conn. at 89.  The court finds that, as a matter of

law, the 18% default interest rate in the Note and Mortgage is not so one-sided as to

rise to the standard of unconscionability.  The <u>Cheshire Mortgage</u> Court upheld the

legality of an 18% interest rate, without even discussing whether the interest rate was

so high as to be unconscionable.  <u>Id.</u> at 86-93.  Furthermore, in that case, the 18% rate

was the contract rate for the loan and not merely the default rate, as was the case in

the Crismaras' mortgage.  <u>Id.</u>  If an 18% interest rate was not so one-sided as to be

unconscionable as the contract rate in <u>Cheshire Mortgage</u>, it would require unusual

circumstances to be unconscionable as the default rate on the Crismaras' mortgage.[2] The court does not find such circumstances present in this case.

2.     The loan was not procedurally unconscionable.  In determining whether the loan was procedurally unconscionable, the court considers all the "relevant facts and circumstances," which would include such facts as the defendant's comfort with the English language, her familiarity with mortgages and mortgage closings, her intelligence, and her comfort with the legal and financial systems.  Id. at 90.  Other facts the court should consider include the commercial setting of the creation of the loan and the financial circumstances of the borrower.  Hamm, 180 Conn. at 948-9.

The court finds that both Crismaras were obviously intelligent, educated, and native-English speakers at the time the loan was taken out.  While Janice Crismara had never applied for a mortgage on her own before this, both she and her mother were experienced businesswomen with some familiarity with contracts.  The court also finds that Janice Crismara was represented by counsel of her choosing at the closing. Janice Crismara testified that she had hired Lambert, Toohey, that she had been in contact with them periodically during the long period in which the loan was being approved, and that she believed they were her attorney at the closing.  The clause in the Commitment Letter dated July 14, 2003, which stated that Lambert, Toohey represented only Emigrant, raises a question as to how competently either party was

---

[2]The court notes that unpaid property taxes in Connecticut are subject to an 18% interest rate.  See CONN. GEN. STAT. § 12-146.  While there may be public policy considerations which would justify an 18% interest rate on unpaid taxes which would not apply to an 18% default interest rate on a residential mortgage, the Connecticut legislature's imposition of an 18% rate for unpaid taxes suggests that such a rate is not unconscionable per se.

represented at the closing, but it does not seriously call into question whether Lambert, Toohey actually represented Crismara.  <u>See</u> Pl.'s Ex. 17.  Although she received loan documents with the default interest rate in them on many occasions, Crismara chose not to read them.  While she testified that she felt rushed through the closing, the court finds that she was not under any duress, no one told her to rush, nor was she unaware that she could ask her attorney to explain any terms to her.  All of these facts weigh against this loan being procedurally unconscionable.

In support of her position that the loan was procedurally unconscionable, the court finds that Janice Crismara was never given a copy of the completed papers until the closing, meaning that she only learned the regular rate of her loan when she sat down to sign the papers.  Further, the court credits Janice Crismara's testimony that her lawyers never went over the terms of the mortgage with her and that they made her feel that they did not have time to answer such questions at the closing.  Nor did her attorneys, Emigrant, or her mortgage broker bring the default interest rate to her attention or explain the seeming contradiction between paragraph 4(D) of the Note, the adjustable rate rider, and the default interest rate rider.

The court also finds that Crismara was in a desperate financial situation; she was already behind on payments on another mortgage, had a large tax lien, and her business was struggling.  The court cannot conclude on this record that no other lender would have made a loan of this size to Janice Crismara, but if any other lenders were willing to, they could not have been many given Crismara's outstanding tax lien, overdue mortgage payments, lack of income, and poor credit score.

Taking all of these facts into consideration, along with the fact that this was a

consumer residential mortgage, the court finds that the creation of this loan was not procedurally unconscionable. The court finds the facts that Janice Crismara was a relatively savvy consumer, familiar with legal documents, represented by counsel of her choice, who had adequate opportunity to notice or ask about the default interest rate are dispositive of the question. Having concluded that the Crismaras' mortgage was neither procedurally, nor substantively unconscionable, the court finds that defendants' special defense of unconscionability fails.

H.    <u>Unenforceable penalty</u>

The Crismaras further assert, as a special defense, that the default interest rate amounts to an unenforceable liquidated damages provision. <u>See</u> Def.'s Amended Trial Memo. at ¶ 23 (Doc. No. ). "Three conditions must be met in order to uphold a contractual provision for liquidated damages." <u>New York Life Ins. Co. v. Hartford National Bank & Trust Co.</u>, 2 Conn.App. 279, 280 (1984). These conditions are: "(1) that the damages are uncertain or difficult to prove; (2) that the parties intended to liquidate damages in advance; and (3) that the amount is reasonable because it is not greatly disproportionate to the amount of damage which the parties assumed at the time of their contract would be sustained if the contract were breached." <u>Id.</u> at 280-1. "Implicit in the transaction is the premise that the sum agreed upon will be within the fair range of those just damages which would be called for and provable had the parties resorted to proof." <u>Norwalk Door Closer Co. v. Eagle Lock and Screw Co.</u>, 153 Conn. 681, 689 (1966).

Assuming the default interest rate provision is a liquidated damages provision, the court finds that the Crismaras have not succeeded in proving that the default

interest rate in the Note was "greatly disproportionate to the amount of damages." <u>New York Life</u>, 2 Conn.App. at 281. In making this argument, the Crismaras relied on deposition testimony from Emigrant employees demonstrating that Emigrant could not produce evidence that it undertook calculations to predict the likely amount of damages when choosing the 18% rate. However, even assuming <u>arguendo</u> that Emigrant chose 18% out of thin air, the question is not what basis it had for choosing that number, but whether that number was "reasonable." The court finds that it was reasonable. First, a bank clearly incurs damages in the event of a default, not the least of which is the opportunity cost to invest the loaned capital in an interest bearing investment. Second, the contract non-default adjustable rate of interest on the Note could go as high as 15.625%; the default rate of interest was only about 2.5 points higher, in the event of default, than the highest non-default rate Crismara had agreed to pay. Therefore, the defendants' special defense of unenforceable penalty or unreasonable liquidated damages fails.

    I.    <u>Laches</u>

The Crismaras also assert a special defense of laches. "Laches consists of two elements. First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant." <u>LaSalle Nat. Bank v. Shook</u>, 67 Conn.App. 93, at 98 (2001). "Lapse of time, alone," without a showing of prejudice "does not constitute laches." <u>Id.</u> In <u>LaSalle</u>, the Connecticut Appellate Court held that the defendant had not established a defense of laches where "the defendants provided no evidence to show that the delay was inexcusable or that it substantially prejudiced them." <u>Id.</u>

The court finds that Emigrant's delay in prosecuting this foreclosure action was not excusable. Emigrant admits that it filed a state court foreclosure action in this case and, after the state court judge denied their summary judgment motion, "Plaintiff made a tactical decision to bring the case in federal court," a tactical decision that was driven, at least in part, by the fact that the Crismaras "heavily contested the state court foreclosure action," the "complexity" of the issues, and the fact that it was more convenient for Emigrant to try the case in federal court given that it had other similar cases already pending in federal court. Pl.'s Trial Brief at 2-3 (Doc. No. 97). The court does not find Emigrant's reconsideration of its "tactical" position over a year after filing the case in state court and after losing a motion for summary judgment is a legitimate excuse for delaying this foreclosure action. Further, the court finds that accruing interest at a rate of 18% while waiting for Emigrant to find just the right forum for their claim prejudiced the Crismaras.

In support of its claim, the Crismaras direct the court to the Connecticut Appellate Court opinion in McKeever v. Fiore, 78 Conn.App. 783 (2003). While the McKeever decision is not binding precedence for this court, the court finds the reasoning of that opinion very persuasive and the factual background quite similar. In McKeever, a foreclosure action took eight years to reach trial from the initial filing. See id. at 786-7. The delay was due to plaintiff's case being dismissed twice for failure to appear, and the judgment being reopened both times. See id. In that case, as in this one, the defendants moved to amend their special defenses to include a defense of unclean hands, and the court denied their motion. See id. However, after hearing evidence, the trial court limited the plaintiff's award of interest to one year, citing its

21

equitable powers.  See id. at 787.

The Appellate Court of Connecticut upheld the trial court's decision based on evidence that plaintiff's delay inequitably increased the amount of debt under the doctrine of "unclean hands," despite the fact that the defendants did not have unclean hands as a special defense.  Id. at 788.  The court found that the trial court's application of the doctrine, even in the absence of an explicitly stated special defense, was appropriate because, "[a]n action in foreclosure is peculiarly an equitable action    . . . . Hence, the court may consider all relevant circumstances to ensure that  complete justice is done."  Id. (internal citations and quotation marks omitted).  "The determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court."  Id.  The court went on to write, "[f]or that reason, equitable remedies are not bound by formula but are molded to the needs of justice."  Id. (internal citation and quotation marks omitted).  Most persuasively, the court wrote that, "[o]ur Supreme Court has insisted that equity must look to substance and not mere form.  A failure to do equity need not be pleaded by the defendant where the pleading on behalf of the plaintiff or the proof discloses the inequitable position of the plaintiff."  Id. at 789 (quoting Bender v. Bender, 258 Conn. 733, 751 (2001) and Connecticut National Bank v. Chapman, 153 Conn. 393, 397 (1966))(internal quotation marks omitted).

The court concludes that, in the circumstances of this case, equity requires that the Crismaras not be held liable for the default interest accrued during the delay in prosecuting this case created by Emigrant's forum shopping.  Furthermore, while the Crismaras have never pled a special defense of unclean hands, Emigrant has been on

22

notice since at least February 26, 2007, that the Crismara's intended to prove at trial that Emigrant unduly delayed the resolution of this matter.  <u>See</u> Joint Trial Memo at 38, Def.'s Proposed Findings of Fact ("Plaintiff artificially inflated the sums purportedly owed to it by failing to take any action to collect its alleged debt for over six months after it withdrew a state court foreclosure matter against Crismara Defendants.") (Doc. No. 52).

In summary, under either its special defense of laches or unclean hands, as recognized by the <u>McKeever</u> court, the court finds that the Crismaras have demonstrated that they were prejudiced by the amount of the default interest accrued during the period between July 13, 2004, when Emigrant filed the state court complaint, and November 18, 2005, when it filed the instant complaint.

J.  <u>Under the Note and Mortgage, the Default Rate is 18%.</u>

The Crismaras argue that the default rate is not 18%, but rather is limited to 15.625% by the terms of the Adjustable Rate Rider.  Exh. 24 at Adj. Rate Rider, para. A.4.F.  "My interest will never be greater than 15.625%."  <u>Id.</u>  However, there is another rider, which provides for the default interest.  Exh. 24 at Default Interest Rider.  The context of the Adjustable Rate Rider makes it clear that the 15.625% cap related to monthly payments.  For example, the caption to the new paragraph 4 of the Note contained in the rider is "Interest Rate and Monthly Payment Changes."  The default rate is a "per annum" rate assessed after default, <u>e.g.</u>, failure to make monthly payments.  The Crismaras' argument that the monthly interest rate cap of 15.625% annually trumps the default rate provision of 18% fails because the Note is clear: the 15.625% cap relates to the monthly payments that are subject to adjustment from time

to time, and not to any period of default.

K.   Debt

Emigrant submitted an Affidavit of Debt itemizing their claimed debt against the Note. See Affidavit of Debt at 2, Pl's Ex. 27a. The court finds that Emigrant has proven the following damages: the principal on the note is $623,167.08, the late charges are $49,506.77, the inspections are $1,263.44, the taxes are $650.00, and the cost of expert Gregory J. Cava are $2,975.00.

For the reasons stated above, the court, using its equitable powers, finds that the default rate of interest applies only for the periods of time between March 1, 2004, when the loan went into default, see id. at 2, and July 13, 2004 when Emigrant filed its state court foreclosure case; and between November 18, 2005, when Emigrant filed the instant federal suit and the date of this Ruling. The court finds that the contract rate of interest of 9.625% applies for the intervening period while Emigrant pursued its state court case. Therefore, the total amount of interest due Emigrant is $412,017.34.[3]

The court finds that Emigrant has not proven that either the state or local conveyance taxes listed in its Affidavit of Debt are applicable to any transaction that occurred in this case, or that they have been incurred. Therefore, Emigrant is not awarded any conveyance taxes.

It is undisputed that Emigrant is entitled to costs and fees pursuant to the terms

---

[3]The court determined that the annual default rate amount is $112,170.07 and daily rate is $311.58, and the annual regular rate amount is $59,979, and the daily rate is $166.61. The default rate is applied for 2 years and 343 days (March 1, 2004 to July 13, 2004; November 18, 2005 to November 18, 2007 to June 18, 2008) and the regular rate is applied for 1 year, 125 days (July 13, 2004 to July 13, 2005, and July 13, 2005 to November 18, 2005).

of the Note, see Note at section 7(E), Pl.'s Ex. 24 ("the Note Holder will have the right to be paid back . . . for all of its costs and expenses in enforcing this note to the extent not prohibited by applicable law."). The court finds that Emigrant has not proven the amount listed as the "costs of litigation" in its Affidavit of Fees. Id.

The court turns to the reasonableness of Emigrant's fee request.
In a recent decision, Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, __ F.3d __, 2008 WL 961313 (2d Cir. 2008), the Second Circuit discussed the two methods courts have used in calculating reasonable fees – the "lodestar" method, which is "based upon 'the hours reasonably spent by counsel . . . multiplied by the reasonable hourly rate,'" Cruz v. Local Union No. 3 of Int'l Broth. of Elec. Workers, 34 F.3d 1148, 1159 (2d Cir. 1994) (citation omitted), and the twelve-factor analysis as developed in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). As the Second Circuit explained, these two methods "considered substantially the same set of variables – just at a different point in the fee-calculation process." Arbor Hill, 2008 WL 961313 at *4. In Hensley v. Eckerhart, 461 U.S. 424, 433 (1983), the Supreme Court "adopted the lodestar method in principle . . . without, however, fully abandoning the Johnson method." Id. at *5. According to the Second Circuit, however, the simultaneous application of these methods "proved to be in tension," and subsequent circuit courts "struggled with the nettlesome interplay between the lodestar method and the Johnson method." Id.

In an attempt to clear up this "confusion," id. at *6, the Arbor Hill court abandons the use of the term "lodestar." Instead, it explains that the better course is:

for the district court, in exercising its considerable discretion, to bear in

25

mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the Johnson factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively.[4] The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case. The district court should then use that hourly rate to calculate what can be properly termed the "presumptively reasonable fee."

Id. at *7 (emphasis in original).

The court finds that Emigrant's Attorney's Fee Affidavit inadequately documents the basis for their claimed fees for several reasons. First, Emigrant's counsel requests fees for work done by "LBH," "JMK" and "PAR," without any explanation of who these people are, what their qualifications are, or what their hourly rate is. See Pl.'s Affidavit of Attorney's Fees at 14, Pl.'s Ex. 28A. Instead, Emigrant's counsel claims the time spent by each of these unidentified individuals at the hourly rate requested by Attorney Ziegler, without submitting any evidence as to why such a rate would be due. As such, the court denies Emigrant's fee request to the extent that it requests fees for which the court has absolutely no evidentiary basis for determining their reasonableness.

---

[4]The Second Circuit directs the district court, "in determining what a reasonable, paying client would be willing to pay, [to] consider factors including, but not limited to, the complexity and difficulty of the case, the available and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether the attorney had an interest (independent of that of his client) in achieving the ends of the litigation or initiated the representation himself, whether the attorney was initially acting pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) the attorney expected from the representation." Id. at *7. The court notes that these factors largely overlap with the twelve Johnson factors. See id. at *4 n.3.

Second, the court finds that the time spent preparing the state court case, only to be withdrawn after losing on summary judgment, was not reasonably spent in the litigation of this case because "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." Arbor Hill, 2008 WL 961313 at *7. Therefore, all fees requested for work done between June 2, 2004 and November 4, 2005, are unreasonable.

Third, the court has renewed the individual entries for Attorney Ziegler and finds that they are reasonable for the case, with the exception of entry 5/8/08 (3.0 hours), 5/9/08 (0.7 hours) and 5/23/08 (3.1 hours) (all related to unreasonable use of experts). Defendants objected to entries added in Emigrant's May 29, 2008 "updated" Affidavit of Attorneys Fees, for the period 5/7/08 through 5/26/08, which 30 additional entries had not been previously disclosed. Defendants are correct that plaintiff's counsel did not have the court's permission to add to its post-trial fee submission anything except actual trial time. However, the court will allow the individual entries for RAZ as reasonable, pre-trial preparation (subject to the exceptions noted above).

After discounting fees requested for unknown individuals, for whom the court has no basis for determining a reasonable hourly rate, and hours spent in the state court action, and for unnecessary expert preparation time, the court finds the total number of hours reasonably claimed by Emigrant's counsel in preparing this case is 183.55 hours. The Crismaras do not dispute, and the court agrees based on its experience generally with attorney's rates in Connecticut and with Attorney Ziegler, that his reasonable hourly rate is $300. Therefore, the court awards reasonable attorneys' fees of $55,065.

Having determined the reasonable "costs of litigation," the court turns to the

remaining items in the Affidavit of Debt. The court finds that neither the testimony of the accountant, nor the testimony from Professor Michael Madison were at all helpful to the court in making its determination. While the court finds that these experts were well qualified, their opinions added nothing relevant to the record. In the instance of the accountant from BloomShapiro, the court finds that he was only asked to state that Janice Crismara did not have sufficient earnings at the time that she signed the mortgage to make the monthly payments; Janice Crismara herself admitted as much on the stand. The court finds that expert testimony was unnecessary and thus not a reasonable expense. Similarly, the court did not find any of Professor Madison's testimony useful or relevant in deciding the issues in this case. As such, the fees for these experts were not reasonably expended in the litigation of this action and are denied.

For the forgoing reasons, the court finds the total amount of the debt on the Note to be $1,089,579.62.

L.    Nature of the foreclosure proceeding.

Emigrant moved the court to enter a judgment of strict foreclosure, see Pl.'s Mot. for Judg. of Strict Foreclosure (Doc. No. 77), and the Crismaras moved for foreclosure by sale (Doc. No. 81). In Connecticut, the choice between foreclosure by sale and strict foreclosure is left to the discretion of the court. See C.G.S.A. § 49-24. The Supreme Court of Connecticut has said that, "a mortgagee is only entitled to the payment of the debt owing him, including such incidental charges as he may add to it." The Fidelity Trust Co. v. Irick, 206 Conn. 484, 488 (1988) (internal quotation omitted). In this instance, the total amount of the debt is $1,071,911.60, whereas the appraised value of

the property as of April 17, 2008, based on comparable sales is $1,700,000.  See

Appraisal at 2, Pl.'s Ex. 26.  Under these circumstances, the court orders foreclosure by

sale.  The sale is to take place by April 1, 2009, so that the Crismara's may have time

to attempt to refinance the property, and barring that, obtain reasonable market value

for the property through private sale.  Given the excess of value over debt, the delay

should not prejudice Emigrant.  The committee is Attorney John Ryan, of Tibbetts,

Keating and Butler, LLC, 43 Corbin Drive, Darien, CT.

IV.     CONCLUSION

        Judgment enters on Counts Two through Five for the defendants.  The court

enters judgment on Count One in favor of Plaintiff.  Plaintiff's Motion for Judgment of

Strict Foreclosure (Doc. No. 77) is DENIED, and Defendant's Motion for Judgment of

Foreclosure by Sale (Doc. No. 81) is GRANTED.  The sale is ordered for April 1, 2009.

Defendant's Oral Motion for Judgment on Partial Findings (Doc. No. 100) is DENIED as

moot.  The clerk is directed to close the case.

**SO ORDERED.**

        Dated at Bridgeport, Connecticut this 18th day of June, 2008.


_____          /s/ Janet C. Hall
                                 Janet C. Hall
                                 United States District Judge